**BANK OF NOVA SCOTIA, Plaintiff**

v.

**ST. CROIX DRIVE–IN THEATRE, INC., MARVIN MAHAN, ST. THOMAS DRIVE–IN THEATRE, INC. and H. E. LOCKHART DEVELOPMENT CORP., Defendants**

Civil No. 80/88

District Court of the Virgin Islands

Div. of St. Croix

December 16, 1982

---

WARREN B. COLE, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

JOEL H. HOLT, ESQ., Christiansted, St. Croix, V.I., *for defendants Mahan, St. Croix Drive-In, Inc. and St. Thomas Drive-In, Inc.*

JOHN G. SHORT, ESQ., Charlotte Amalie, St. Thomas, V.I., *for defendant Lockhart Development Corp.*

O'BRIEN, *Judge*

## MEMORANDUM OPINION AND JUDGMENT

The genesis of this action is a debt incurred by several of the defendants for which another defendant agreed, in part, to act as surety. The trial was held on July 20, 1982. The plethora of memoranda submitted by the respective parties, both before and after the trial, constitute a monument to the problems inherent in complex

financial dealings when the intent of the parties is not clearly defined.

## I. FINDINGS OF FACT

The St. Croix Drive-In, Inc. ("St. Croix Drive-In") was pleased with the success of its theatre operation, and decided to expand to St. Thomas. At the same time, it wanted to improve its St. Croix facility. It needed money to accomplish both objectives. In December 1971, the Bank of Nova Scotia ("BNS") agreed to supply the funds. A loan agreement was signed among the bank, St. Croix Drive-In, St. Thomas Drive-In, Inc. ("St. Thomas Drive-In"), which was the subsidiary corporation created by St. Croix Drive-In to build and operate the St. Thomas facility, and certain individuals. By the terms of that agreement, the bank was to lend St. Croix Drive-In $400,000. Of that sum, St. Croix Drive-In would advance $250,000 to St. Thomas Drive-In. Various mortgages, guaranties and other instruments of debt and security were agreed upon.

The money was loaned by the bank, the specific advance was made by St. Croix Drive-In to St. Thomas Drive-In, the drive-in theatre on St. Thomas was built, and it commenced operations. The St. Thomas Drive-In was situated on land leased from H. E. Lockhart Development Co. ("Lockhart"), for a ten-year term with renewal options.

The actual instruments creating the debt to BNS were five promissory notes of varying amounts, but totaling $400,000, which coincided with the dates the funds were placed in the St. Croix Drive-In account by BNS. The last note, for $68,000, was dated May 12, 1972. All other instruments of debt as between all parties and the bank were either superfluous, or were security instruments and guaranties.

When all the paperwork, superfluous or otherwise, was completed, St. Croix Drive-In was in debt to BNS in the amount of $400,000. That payment was guarantied by St. Thomas Drive-In, and the two principals in the theatre corporations, Louis Principe and Marvin Mahan. There was also a mortgage on the St. Croix Drive-In property on St. Croix, and a leasehold mortgage on St. Thomas Drive-In's property on St. Thomas leased from Lockhart.

And, finally, there was one other document of importance. Designated a "stipulation", it provided that, under certain conditions, Lockhart would be required to assume and pay the $250,000 leasehold mortgage. The parties to the stipulation (whose draftsmanship

is of uncertain origin) were: BNS, St. Thomas Drive-In, and Lockhart. Its essential paragraph stated:

> IT IS HEREBY AGREED that Landlord will not cancel the lease of Tenant without first serving notice on the Bank in writing of its intention to do so and granting Bank fifteen (15) days from the date of said notice to cure any defects on behalf of Tenant. Landlord further agrees that in the event Tenant shall for any reason default in said mortgage and as a result of such default mortgagee shall declare the mortgage due and payable in full, or shall default in terms of the aforesaid lease to the extent that Landlord shall avail itself of the remedy of cancellation while the premises are still encumbered by the said mortgage, Landlord will exercise the right of cancellation provided for at paragraph 12 of said lease, and upon cancellation thereof, will assume the remaining unpaid principal balance of the mortgage and any accrued interest thereon in all respects as though Landlord had originally executed said mortgage and mortgage note accompanying the same and will henceforth be deemed the mortgagor. This agreement, however, shall be limited to the amount due on the mortgage not exceeding TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) and Landlord shall under no circumstances be responsible for a greater principal amount than the aforesaid $250,000.00.

While at all times the instruments of debt were called "demand" loans, as between the bank and St. Croix Drive-In, payments were structured under an agreed-upon system by which there would be monthly payments of interest as it accrued, and monthly payments of $5,555.56 toward the principal. The loan under that agreement would be retired in six years, before expiration of the ten-year lease term. Lockhart believed that the loan was to be retired by installment payments, but did not know what the monthly payments were to be.

In 1972 and through March 1973, the payments were made according to the agreement. The bank had set the $400,000 loan up as, in fact, two loans to St. Croix Drive-In: one for $150,000 for the St. Croix facility, and one for $250,000 for the St. Thomas facility operated through its subsidiary. As payments of interest were made during that 1972–73 period, the payments were credited to the interest due on the entire amount. However, the $5,555.56 payments, when made, were credited only to the $150,000 and were reflected on the separate ledger card kept for that amount. Because of the

result reached herein, we do not determine the efficacy of this arrangement as to Lockhart.

Problems of repayment on the described installment plan arose in early 1973, however. An internal bank memorandum dated May 18, 1973, describes the loan as four months in arrears. Rather than invoke all of its rights under the multitude of debt and security instruments, however, the bank agreed to the St. Croix Drive-In's request for a six-month moratorium on principal payments, which eventually stretched into a year. Even later, BNS agreed to modify the payment schedule and monthly payments were to be made which provided for interest as it accrued, and a small payment toward principal.

On May 8, 1974, the bank made its first contact with Lockhart. A letter was dispatched by a bank official advising that the loan was in default. It was giving such notice, the bank said, "in the event we choose to declare the mortgage due and payable in full in the lite (sic) of the stipulation dated November 11, 1971."

The record is clear that upon receipt of the letter, Herbert Lockhart called the bank and discovered that, after 2½ years, no payments had been credited on the $250,000.00 allocated to St. Thomas Drive-In. He expressed surprise. The bank initiated only three other contacts with Lockhart. All were letters from the bank's counsel, dated January 16, 1975, November 3, 1976 and March 2, 1981, respectively. All demanded that Lockhart make good on the $250,000 plus accrued interest. All requests were ignored. Mr. Lockhart, as president of Lockhart, represented his corporation in all dealings with the parties.

Lockhart also refused to attend any meetings with the bank designed to resolve the default. Lockhart was not a participant, nor did it have any knowledge of, the moratorium or other modifications to the loan. Lockhart did know that efforts were being made to work things out, and did nothing to impede those efforts. In fact, as landlord, Lockhart reduced the St. Thomas Drive-In monthly rent, and acceded to Mahan's request to be patient while attempts were made to sell the asset and pay the debts. A sub-lease of the St. Thomas facility was made without Lockhart's knowledge or consent.

The situation did not improve, and in May 1979, Mahan pressed the bank to take action against Lockhart. Obviously, he considered that if this was done, at least $250,000 of the loan would be paid by someone other than himself, and St. Croix Drive-In would rid itself of a major headache. Mahan testified that the bank promised action within two weeks.

The two weeks stretched to nearly a year, and it was not until April 18, 1980, that the bank filed an action in debt and foreclosure against both the St. Croix Drive-In and the leasehold on St. Thomas. Curiously, the bank did not seek anything against Lockhart in this action, but named Lockhart only as an entity with an interest in the St. Thomas leasehold property sought to be foreclosed, under 28 V.I.C. § 532.

On March 26, 1981, the bank, in a separate action, sought to recover $250,000 plus accrued interest from Lockhart in an action in debt.

The lease between St. Thomas Drive-In and Lockhart expired in late 1981, the option to extend its initial ten-year term having never been exercised.

Both actions were consolidated for trial, and the proceeding took place before the Court on July 20, 1982. The bank filed an amended complaint in the consolidated action, seeking judgment in debt for the full amount owing from St. Croix Drive-In and its guarantor, St. Thomas Drive-In. It seeks judgment against Lockhart for $250,000 of the debt owing plus interest accrued against that amount. And, it seeks foreclosure of the St. Croix Drive-In mortgage on St. Croix, and full foreclosure of the leasehold mortgage against Lockhart, claiming that since Lockhart was to take over the mortgage and debt, the fee ownership of that property is now fully subject to foreclosure.

Not sought at this juncture is any relief from any other individual guarantors of any of the obligations, or persons ostensibly providing security for the loans, such as Louise Augenstein or Dorothy Principe.

## II. ISSUES

This decision confronts the following questions:

(1) What instruments actually created the debt for $400,000?
(2) Were they "demand" notes or otherwise?
(3) Is the bank entitled to foreclosure against any of the defendants?
(4) Is the defense of laches valid in this case?
(5) Is Lockhart liable to the bank on the $250,000 portion of the loan and is foreclosure available against Lockhart's St. Thomas property?

The Court makes no determination in this action as to what position Mahan and Principe occupy in this transaction, and whether

325

any relief is available to the bank against the property of Louise Augenstein and Dorothy Principe. Likewise, various cross claims between Lockhart and Mahan will not be reached because they are mooted by the outcome in this case.

The Court answers the various questions in this manner, as is further discussed in the opinion herein:

(1) The instruments of debt are those actually issued at the time the funds were deposited to the St. Croix Drive-In account.
(2) They are installment notes, notwithstanding their designation in the instrument as "demand" notes.
(3) The bank is entitled to judgment of foreclosure against both drive-in corporations.
(4) The bank's rights against Lockhart ended with the running of the statute of limitations on the notes and the expiration of the leasehold, without renewal.

## III. DISCUSSION

### A. *The Bank and the Drive-Ins*

No one seriously disputes the fact that the bank has a valid claim for foreclosure against the drive-in corporations. As is more particularly discussed later in this opinion in the section dealing with Lockhart, the Court finds that the notes in question are actually installment notes and not demand notes.

They total $400,000 and there is no suggestion that the statute of limitations, as to the drive-ins, has run against the debt or the security. The notes were executed by St. Croix Drive-In in favor of the bank, and the obligation was guarantied by the St. Thomas Drive-In. Both are primarily liable in the amount of $453,364.58 principal and interest to July 20, 1982, plus accrued interest to the date judgment is entered, together with costs and fees.

■ Likewise, foreclosure will be permitted against the St. Croix Drive-In property mortgaged to the bank as security for the loan, but not the Augenstein-Principe property. The bank, in its amended complaint, has not sought any relief against those persons or their property.

The defense of laches was raised by Mahan on behalf of the drive-in corporations and himself. As to him, any defenses against the bank are premature, since they have not sought any relief against him. As to the drive-in corporations, some cases suggest that the defense of laches is not available to them so long as the statute of limitations has not run. United States v. Bedford, 491 F.Supp. 851

(S.D. N.Y. 1980); Riordan v. Ferguson, 147 F.2d 983 (2d Cir. 1945). Other courts disagree. Ratner v. Miami Beach First National Bank, 368 So.2d 1326 (Fla. 1979); Wisconsin Brick & Block Corp. v. Vogel, 195 N.W.2d 664 (Wisc. 1972).

■ We find, however, that the drive-in corporations have not demonstrated any prejudice from the delay which would necessarily create the right to the defense of laches, and so on that basis, the proof must fail and the defense must fall. We make no comment on what the Court's finding in this regard would be should the bank proceed against Mahan's guaranty, or whether laches is a valid defense to a foreclosure action where the statute of limitations has not run.

### B. *The Bank and Lockhart*

#### 1. *What Type of Notes?*

The relationship between the bank and Lockhart was that of creditor and surety. The St. Thomas Drive-In was the principal, albeit by reason of its primary obligation created by its unconditional guaranty of the St. Croix Drive-In obligation for the $400,000. The bank contends that Lockhart must answer for $250,000 of that debt under the "stipulation" the parties entered into, together with accrued interest and costs. Lockhart's contention is that it is discharged, for a number of reasons, from any liability. This raises questions of the statute of limitations, and the modifications or extensions, if any, of the debt instruments or the time for payment of the debt, as to Lockhart.

On the face of it, the notes are payable "on demand". In reality, however, it was always the intention of the parties that the principal be paid on an installment basis, and there was testimony by Herbert Lockhart at trial that this was his understanding as well. The following facts from the evidence demonstrate fully that it was the intention of the parties that the note be repaid on an installment basis:

(1) In an internal memorandum dated November 5, 1971, the Bank states "repayment will be made over a period of six years on a monthly amortization basis, commencing March 1, 1971."

(2) In a bank report detailing the security to be received for the loan, dated August 1, 1972, the final notation states: "Terms: Demand (repayable at rate of $5,555.56 per month commencing March 1, 1972)." Simple mathematics demonstrates that the sum

327

above, paid over seventy-two consecutive months, would amount to $400,000.

(3) In a letter dated November 24, 1972, St. Croix Drive-In requested "an extension of six years to our original six-year payback period, making the payback period twelve years instead of the original six years, decreasing our monthly payments."

Accordingly, while at first blush the $400,000 loan appears to have been made on a "demand" basis, in fact it was an installment loan, payable over seventy-two consecutive months starting March 1, 1972, with principal payments of $5,555.56 each month, together with interest on a monthly basis as it accrued. If paid according to its terms, then, it would have been paid well within the ten-year period of the lease of land from Lockhart on which the leasehold mortgage was placed. Herbert Lockhart testified that he knew there would be installment terms, and, as an experienced businessman, he knew as well that this was a more logical method of repayment than a "demand" note which permitted the bank to call the loan at any time, even a short time after execution of the loan documents. It is the bank's carelessness, and nothing else, which created the confusion.

■ ■ Simply because a note is designated as payable "on demand" does not make it so. While a party may have a right to demand payment at any time, there can also be a clear agreement that such demand will not be made so long as the other party is meeting additional terms. DiBattista v. Butera, 244 A.2d 857, 859 (R.I. 1968). Moreover, where the circumstances of a situation clearly demonstrate the intent of the parties that a loan be otherwise than payable "on demand", that intent will be given force and effect. 10 C.J.S., Bills & Notes, § 247, p. 744 (1938).

2. *Did the Bank Extend the Time for Payment?*

Things went well for the loan until early 1973. Until that time, the principal and interest were paid every month. From the evidence, in 1973 the following fact pattern emerged:

(1) In an internal bank memorandum of May 18, 1973, it is reported that "the overdraft has not been eliminated and payments on the loans are four months in arrears". There is also the first discussion of a "moratorium" of six months on principal repayments, from March 1973 to September 1973.

(2) The moratorium was in fact given, and on September 10, 1973, another internal BNS memorandum notes that the St. Croix

Drive-In was asking for an additional six months before principal repayments would be required.

(3) On May 8, 1974, the BNS wrote to Mr. Lockhart advising him that the loan was in default. Lockhart called the bank, and, when told the status of the $250,000 debt, expressed surprise that after 2½ years the loan had not been reduced.

(4) The bank continued to extend the time for payment even after notifying Lockhart of the default. At no time, however, did BNS ever notify Lockhart that it was extending the time for payment of the loan, or granting up to a year of grace during which no payments of principal would be required.

(5) Eventually, BNS was reduced to begging for $3,000.00 a month *total* payments (of which only about $600.00 would have been credited to principal reduction), which it received only spasmodically. This was raised to $3,500.00 with little significant improvement in adherence to the payment schedule.

The grant of an extension of time for repayment, and then a reduction in the payments themselves is significant to the question of Lockhart's posture. So long as the loan was being repaid on its original terms, it would be fully paid off before the ten-year lease term expired, and Lockhart would consider that the deal had been a good one.[1]

But when the bank agreed to accept $3,000.00 a month, of which only $600.00 would go to principal, it becomes clear that the loan could never have been repaid in the ten-year period of the lease. When it is remembered that all of this was taking place against the backdrop of Lockhart's own problems in obtaining payment of the monthly rental, it can be appreciated that it would not relish being obligated under the stipulation into an unpredictable future never contemplated.

■ ■ That it did not know of or consent to the change in the original terms is clear. That the bank's failure to obtain its consent, or to expressly reserve its rights against Lockhart was at its own peril, is also clear. Section 129(1) of the Restatement of Security applies to this situation, since Lockhart was not a "compensated" surety as that term is known. A "compensated" surety is an entity in the business of executing surety contracts for a premium, and is

---

[1] Mr. Lockhart testified that he thought the loan was for $250,000 and that he never knew of the exact nature of the relationship among St. Croix Drive-in, St. Thomas Drive-In and BNS. In view of the outcome of the case, that lack of knowledge is not as important as it otherwise might be.

considered better acquainted with the risks inherent in such dealing. Section 129(1) states:

> (1) Subject to the rule stated in Subsection (2) and to the rules in respect of negotiable instruments, where the principal and creditor, without the surety's consent, make a binding agreement to extend the time of payment by the principal, the surety is discharged unless the creditor in the extension agreement reserves his rights against the surety.

The consideration involved in the extension is ample. Mahan agreed to make certain payments, and it appears that other security was also provided.

Certainly the St. Croix Drive-In could have enforced the extended payment privilege against the bank. There can be no claim, therefore, that the extension was nonbinding, and, hence, outside of the § 129(1) requirement that the agreement to extend be binding.

■■ Certainly, the silence by a surety in the face of activity by the principal and the creditor is not ordinarily regarded as acceptance or consent to any changes in the original arrangement. A/C Electric Co. v. Aetna Insurance Co., 247 A.2d 708, 711 (Md. 1968). Likewise, it is not enough to bind him that he is informed, and remains passive. He is not required to object or protest. American Iron & Steel Co. v. Beall, 61 A. 629, 631 (Md. 1905).

■ By that same token, where a surety raises questions after being alerted to the claim of a creditor, the surety cannot be held to have waived modifications. Coleman Capital Corp. v. Traveler's Indemnity Co., 443 F.2d 47, 50 (2d Cir. 1971).

The mystery of it all to an observer who has read each bank memorandum, is why the bank was so dilatory in holding Lockhart to the stipulation, and why it was so casual in its legal obligation to Lockhart's surety position, while dotting every "i" and crossing every "t" with the drive-ins, even to the extent of getting duplicate promissory notes signed.

### 3. Has the Statute Run on the Debt as Against Lockhart?

While the above section describes the discharge of Lockhart because of the bank's failure to comply with the Restatement of Security, it is still worthwhile to consider the question of the statute of limitations as against Lockhart. Even if BNS fully protected itself, the question remains whether the statute of limitations has run against the bank in any attempt to collect on the debt against Lockhart.

■ The Court has found from the evidence that the actual default by the St. Croix Drive-In took place in early 1973. It was at that time, also, that the rights of the bank against Lockhart accrued and when it could have demanded and enforced the assumption by Lockhart of the debt of the drive-ins up to $250,000. The six-year debt statute of limitations, as to Lockhart and the bank, began to run, then, in the spring of 1973, and it expired in the spring of 1979. See 5 V.I.C. § 31(3)(A) (1981). No partial payments or new promises made to the bank by the drive-ins would have created a new date of accrual of rights against Lockhart. See Restatement of Security, § 120 comment a. See also id., Illustration 2 (example parallels situation at hand). All of this is to point out that the bank's rights against Lockhart accrued in early 1973 and expired in early 1979.

■ The Court does not accept the bank's contention that the statute did not begin to run until it made a demand on Lockhart. Lockhart fits the category of a surety who undertakes to pay money or perform other acts in the event that his principal fails thereon, and the surety is directly and immediately liable for the debt. Wurlitzer Co. v. Oliver, 334 F.Supp. 1009, 1013 (W.D. Pa. 1971), citing to In Re Brock's Assigned Estate, 166 A. 778 (Pa. 1933).

In the context of the statute of limitations against Lockhart, it is obvious that whether the notes were demand notes or installment notes, simply does not matter. Even giving the bank the benefit of the doubt and the later commencement date of the running of the statute for the installment notes, i.e., installment notes as compared to "demand" notes, it had run out before any action was undertaken.[2]

■ 4. *Can the Bank Still Foreclose Against Lockhart?*

It has been forcefully argued that the bank still has the right of foreclosure against Lockhart, even if the time for action on the debt expired in early 1979. Of course, if the surety, Lockhart, is discharged by reason of the behavior of the creditor (the bank), it can also be argued that the right of action against the property is no longer available. But the law is clear that separate actions are available in actions for debt and against a mortgage. Harding v. Trenor, 157 F.Supp. 350, 357 (D. N.D. 1957) which held, as the general rule:

---

[2] If the notes were indeed "demand" notes, the statute of limitations against Lockhart would have commenced on the date of issuance. Since the last of the five notes was issued in 1972, the statute would have run in 1978, well before the action herein was filed. United States Fidelity & Guaranty Co. v. Krebs, 190 So.2d 857, 859–60 (Miss. 1966).

> [the creditor] may either sue, within the time limits allowed by statute, on the principal obligation or seek to satisfy the debt by action of foreclosure on the mortgage.

See also Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc., 452 F.2d 1346, 1358 (D.C. Cir. 1971), particularly the cases cited at note 75. Clearly, the right of foreclosure is a right separate from the right to sue on the debt. Whether that right of foreclosure exists in a situation where the surety has been discharged under § 120 of the Restatement of Security is not an issue the Court must reach. The Court holds that even with the right of foreclosure as a separate right, in the case at hand, the intent of the parties was that the right extend only to the leasehold, and not to Lockhart's fee ownership, and the leasehold has expired, rendering the action moot. To determine the intention of the parties, we need look no further than the motion filed by the bank to dismiss the foreclosure in January 1982. An affidavit was filed in support of the motion, in which bank's counsel states:

> 4. By reason of the termination of said estate, the above-captioned action is moot insofar as it seeks foreclosure of the mortgage encumbering said estate.

In other words, since the mortgage was only on the leasehold estate, and Lockhart's security obligation only extended to the leasehold estate, and the leasehold estate having expired after the ten-year term, therefore, the foreclosure action is moot. Counsel's affidavit was undoubtedly prepared after consultations with his client, and in reliance on the bank's internal memoranda concerning the subject.

On June 22, 1979, in one of those internal memoranda, the Bank discussed working out its differences with Lockhart. If successful, the memorandum said Lockhart would be released from further liability "and his leasehold would be returned to him free and clear."

Since the bank was the primary beneficiary of the stipulation which obligated Lockhart in the first instance, clearly its own intent as to what it was getting by way of security, expressed before there was even a suggestion that Lockhart's fee interest in the property could be subjected to the mortgage, should prevail.

To sum up, the bank cannot foreclose on the leasehold, it having expired, and it cannot foreclose on Lockhart's fee, because that was never the intent of the parties. Its security rights extended only to the leasehold granted the drive-in, and the expiration of that leasehold extinguished the bank's security rights against Lockhart.

332

### 5. *Cross and Counter Cross Claims*

Several cross claims and counter cross claims have been filed by various defendants. Only one should concern us in this opinion, the others being moot by reason of the decision reached herein.

Lockhart filed a cross claim against Mahan consisting of two counts. The second count sought to recover rents from Mahan on the theory that he was personally liable for the St. Thomas Drive-In's debts because of his actions.

 From the evidence, the Court finds that the relationship between Mahan and Lockhart during the term of the St. Thomas lease was that of Mahan as corporate officer, and not as an individual. Thus, he is not liable for any rents which were the obligation of the St. Thomas Drive-In, and that count will be dismissed with prejudice for failure of proof.

All other counts of the cross claims and counter cross claims will be dismissed without prejudice as moot.

### CONCLUSION

In summary, then, the Court makes the following conclusions of law:

(1) The bank is entitled to judgment of debt for the full amount and foreclosure against the St. Croix Drive-In and the St. Thomas Drive-In, the foreclosure, only against the property of the St. Croix Drive-In on St. Croix.

(2) The bank is not entitled to any recovery against Lockhart, either in debt or for foreclosure, of any claimed lien on Lockhart's St. Thomas property.

(3) All other contentions of the various parties are rendered moot by the conclusions herein.

(4) Count II of the claim by Lockhart against Mahan will be dismissed with prejudice. All other cross claims and counter cross claims will be dismissed without prejudice.

Judgment will enter accordingly.

### JUDGMENT

THIS MATTER came for trial on July 20, 1982. All parties were present and represented by counsel, and all parties presented evidence. At the conclusion of the trial, all parties submitted extensive memoranda in support of their respective positions. The Court having heard the evidence, and having reviewed all memoranda, and having filed its Memorandum Opinion of even date herewith, now therefore it is

ORDERED, ADJUDGED AND DECREED:

1. THAT judgment be and the same hereby is entered in favor of the Bank of Nova Scotia and against St. Croix Drive-In, Inc. and St. Thomas Drive-In, Inc., jointly and severally, in the amount of $453,364.58, together with interest at the legal rate from the 20th day of July 1982, and attorneys' fees and other costs to be fixed by the Court upon application, if such be made within ten days of the date of entry of judgment herein.

2. THAT the amended complaint of the Bank of Nova Scotia as to Lockhart Development Corp. be and the same is hereby DISMISSED with prejudice, with attorneys' fees and other costs to be awarded to Lockhart Development Corp. upon application, if such be made within ten days of the date of entry of judgment herein.

3. THAT Bank of Nova Scotia have judgment of foreclosure upon the following described property situated in St. Croix, U.S. Virgin Islands:

> Plot No. 18, Estate Plessen, Matr. 29 Princesse Quarter, as shown on PWD Drawing No. 2345, dated April 2, 1968, revised September 11, 1968, together with all rights, title and interest in and to the land underlying the public road adjoining the North boundary line of said plot No. 18 to the center line of said Public Road, the whole consisting of 14.413 U.S. Acres.

4. THAT the interests of any defendants, including Marvin Mahan and St. Croix Drive-In, Inc., in the above described real property which are subsequent in priority to the mortgage of the Bank of Nova Scotia be forever barred and foreclosed of all rights, equities and claims in or to the mortgaged premises, and all parts thereof, except such rights as are by statute provided.

5. THAT the Marshal of this Court is directed to advertise in the St. Croix Avis and sell the said property in accordance with the provisions of law and report the results of such sale to this Court. From the proceeds of the sale the costs and expenses thereof shall first be paid; from the remainder thereof, there shall be paid to the Bank of Nova Scotia the amount of its judgment herein, together with interest thereon from the date of this judgment at the legal rate of interest. In the event the proceeds of sale are not sufficient to satisfy the judgment, interest and costs, then the Clerk of said Court be and the same is hereby ORDERED to enter a deficiency judgment against St. Croix Drive-In, Inc. and St. Thomas Drive-In, Inc., jointly and severally for the amount of such deficiency.

6. THAT all cross claims and counter cross claims filed herein be and the same are hereby DISMISSED, without prejudice, except for Count II of H. E. Lockhart Development Corp.'s claim against Marvin Mahan, which is DISMISSED with prejudice.